IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CARLA LEWIS BY AND
THROUGH HER GUARDIAN,
KATHERINE DAVIS                                                                                           PLAINTIFF

V.                                         NO. 4:13CV0589-DPM

OLD DOMINION FREIGHT
LINE, INC. AND MELVIN HOWZE                                                               DEFENDANTS

### DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE TESTIMONY OF SARAH MOORE

Defendants request that this Court exclude the testimony of Plaintiff's life care planner, Sarah Moore, because the testimony is not based on sufficient facts or data and is not the product of reliable principles and methods. Further, Moore failed to reliably apply principles and methods of life care planning to the facts of the case.

Pursuant to Federal Rule of Evidence 702, an expert witness may testify in the form of opinion if: (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "the testimony is based on sufficient facts or data;" (c) "the testimony is the product of reliable principles and methods;" and (d) "the expert has reliably applied the principles and methods to the facts of the case." "When evaluating the admissibility of expert testimony under Federal Rule of Evidence 702, the district court must look to both the relevancy and the reliability of the testimony." *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1040 (8th Cir. 1999). "This gate-keeping function is applicable to 'technical' and other 'specialized' expert testimony, in addition to the testimony of scientific experts." *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1040 (8th Cir. 1999).

In determining whether to admit expert testimony, the District Court "should first determine under Rule 104(a) whether the expert's testimony rests on a reliable foundation." *McKnight by & Through Ludwig v. Johnson Controls*, 36 F.3d 1396, 1406 (8th Cir. 1994). "An expert opinion 'must be supported by appropriate validation – i.e. good grounds, based on what is known.'" *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 988 (8th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). "In sum, the district court's gatekeeping role separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). "Admissible expert testimony must be grounded upon scientifically valid reasoning or methodology." *United States v. Dico, Inc.*, 266 F.3d 864, 869 (8th Cir. 2001) (quoting *Daubert*, 509 U.S. at 595).

"An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994). Further, "[a]n expert's opinion as to damages must be causally related to the alleged harm." *Id.* "The court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury" and "[e]xpert opinion evidence based on assumptions not supported by the record should be excluded." *Id.* at 143.

In the present case, Sarah Moore's opinions should be excluded because the methodology utilized renders it unreliable and it does not rest on a reliable foundation of the facts at issue in this case. In this regard, the opinions are not based on Carla Lewis' medical records and fail to consider or analyze Lewis' pre-existing medical conditions and their potential causal relationship to the life care plan generated. *See Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (affirming exclusion of damages expert where the expert "failed to

consider the effect of competition," "his theory of causation was questionable, and his testimony was based on a report prepared before Children's claims were narrowed for trial").

Sarah Moore was retained by Plaintiff as an expert for life care planning purposes. *See* Exhibit A, Sarah Moore Deposition, page 4. She was retained on July 29, 2013. *See* Exhibit A, Sarah Moore Deposition, page 5. In generating her life care plan, Moore conducted an interview with Carla Lewis and her mother, Katherine Davis. *See* Exhibit A, Sarah Moore Deposition, pages 9-10. Moore also spoke with a CNA providing care for Lewis, who was present during Moore's interview with Lewis and Ms. Davis. *See* Exhibit A, Sarah Moore Deposition, pages 26-27. It is anticipated that, based on the limited information reviewed or obtained by Moore, as well as the representations of Plaintiff's counsel, she will seek to testify regarding her opinion as to future costs for Lewis' needs "related to the brain injury she sustained" in the November 25, 2012 motor vehicle accident at issue in this litigation. *See* Exhibit B, Moore's Report.

In preparing her opinions, Moore did not speak with Mr. Davis, one of Carla Lewis' primary caretakers. *See* Exhibit A, Sarah Moore Deposition, page 26. Nor did Moore speak with Ms. Lewis' former employers or review any depositions taken in connection with this litigation. *See* Exhibit A, Sarah Moore Deposition, pages 28-29. Moore was not provided any information about services Lewis received, prior to the subject accident, from the Students with Disabilities Department at UALR, such as testing accommodations, in connection with her obtaining a degree. *See* Exhibit A, Sarah Moore Deposition, page 67. She was also not provided with any of Lewis' employment files demonstrating former employers' criticisms of her job performance prior to the subject accident. *See* Exhibit A, Sarah Moore Deposition, page 67. Moore had also not reviewed Lewis' Social Security Disability file evidencing Lewis' pre-accident disabilities. *See* Exhibit A, Sarah Moore Deposition, page 67.

Perhaps most significant, Moore has acknowledged that she looked at no medical records in this case despite her normal practice of doing so.  *See* Exhibit A, Sarah Moore Deposition, page 24.  Moore prepared this life care plan without having received a written up-to- date summary and long-term prognosis for Ms. Lewis.  *See* Exhibit A, Sarah Moore Deposition, page 9.  Moore acknowledged that she typically reviews medical records and depositions that have been taken from the individual and family members but that she had not done so in this case.  *See* Exhibit A, Sarah Moore Deposition, page 23.  In fact, Moore could not recall ever issuing a life care plan where she had not seen at least limited medical records.  *See* Exhibit A, Sarah Moore Deposition, page 100.  Moore acknowledges that review of a plaintiff's medical records is important because it provides a history of what occurred in the case and provides her with clear documentation of an individual's injuries from a medical perspective.  *See* Exhibit A, Sarah Moore Deposition, page 25.  Moore testified that medical records showing current treatment serve to verify her theory about a case and information provided by family members.  *See* Exhibit A, Sarah Moore Deposition, page 25.  She often reconciles what the medical records say with what information she receives from a personal interview with the family.  *See* Exhibit A, Sarah Moore Deposition, page 25.  She further acknowledged that depositions can often provide information on current status in the home.  *See* Exhibit A, Sarah Moore Deposition, page 25.

In deposition, Moore further confirmed that she had requested Lewis' medical records and the depositions of Lewis and her family members (and, in doing so, further acknowledges their importance in formulating a valid life care plan) but was not provided them because it was her understanding they had been unavailable.  *See* Exhibit A, Sarah Moore Deposition, page 23 & 84.  Moore admitted the information was never produced to her for her review.  *See* Exhibit A, Sarah Moore Deposition, pages 24-25.  She also acknowledged that review of the medical

records would have been helpful and that she would have also preferred to review the depositions in this case, which is certainly evident from her communications with counsel prior to her deposition.  *See* Exhibit A, Sarah Moore Deposition, page 84.

The importance Moore places on all of the information referenced above is further evidenced by her communications with Plaintiff's counsel both before and after her opinions were issued.  Said emails were produced by Plaintiff's counsel on February 4, 2015, after the deposition of Moore was completed.  From her earliest engagement, Ms. Moore was assured she would receive medical records. *See* Exhibit C, email from Gary Barrett to Sarah Moore, July 29, 2013 and July 30, 2013.  Apparently, having received no information over two months later, Moore followed up with Plaintiff's counsel, Kathryn Hudson, seeking the things she would need to begin preparation of her report, including medical, employment and educational records.  *See* Exhibit D, email from Sarah Moore to Kathryn Hudson, October 10, 2013.  On April 30, 2014, Plaintiff's expert reached out to Plaintiff's counsel, Gary Barrett, referencing a telephone conference she had with Ms. Hudson on September 25, 2013 in which records were requested and followed by an email request "with a list of records [Moore] would need to start the case." *See* Exhibit E, email from Sarah Moore to Gary Barrett, April 30, 2014.  Kathryn Hudson responded to Moore on September 29, 2014, verifying none of the information repeatedly requested had been made available to Moore and indicating a limited amount of medical records, as chosen by counsel, would be forwarded.  *See* Exhibit F, email from Kathryn Hudson to Sarah Moore, September 29, 2014.

In an undated email from Moore to Kathryn Hudson, Moore stressed her need to get started as soon as possible advising she would have to contact medical providers to get future treatment recommendations.  *See* Exhibit G, email Sarah Moore to Kathryn Hudson, as appears

below email from Kathryn Hudson to Sarah Moore, October 9, 2014. However, instead of providing the expert with any records, Ms. Hudson advised the production of said records would be cost prohibitive and provided her own brief summary of the medical issues. *See* Exhibit G. Ms. Hudson further indicated that the limited records she collected on her client were in the possession of defense counsel. *See* Exhibit G. However, those records have never been made available to the defense despite numerous requests for inspection.

It is also important to note that on October 15, 2014, Defendants supplemented their discovery responses providing a set of disks to each of Plaintiff's counsel containing all records collected on Carla Lewis, including all of her medical records before and after the accident, employment records, school records and Social Security records. *See* Exhibit H, screen shot of the file and sub-file names of all records produced. There were well over 13,000 pages of documents produced, all of which were clearly separated and labeled by provider. *See* Exhibit H. As such, as of October 15, 2014, Plaintiff's counsel were in possession of all the records requested by Moore prior to the issuance of her report and Plaintiff's expert disclosure deadline.

The expert disclosure deadline, per the Second Amended Scheduling Order [Doc. 19], required disclosure of Plaintiff's expert witnesses and their opinions by November 17, 2014. On November 21, 2014, defense counsel, Amy Tracy, wrote Plaintiff's counsel inquiring as to the status of the anticipated life care planner's report and ultimately agreed to an extension for receipt of the report until Monday, November 24, 2014. *See* Exhibit I, email correspondence from Amy Tracy to all counsel, November 21, 2014, 4:12 p.m. and 4:35 p.m. Correspondence from Moore to Kathryn Hudson indicates Moore's report was not provided to Plaintiff's counsel until later that same evening. *See* Exhibit J, email correspondence from Sarah Moore to Kathryn Hudson, November 21, 2014, 6:04 p.m. Ultimately, Moore's opinions, which were generated

without access to the medical and employment records of Lewis, were produced to Defendants on Saturday, November 22, 2014.

Defendants made timely disclosure of their experts and experts' reports on December 15, 2014, which included a life care planner, Tanya Owen, Ph.D., and neurologist, Dr. Michael Morse. It was not until January 6, 2015, the day after Plaintiff's deadline to disclose rebuttal reports, that Plaintiff's counsel provided Moore with the expert report of Owen. *See* Second Amended Scheduling Order [Doc. 19]; *See* Exhibit K, email correspondence from Kathryn Hudson to Sarah Moore, January 6, 2015. In this email, Ms. Hudson advised Moore that defense experts, Owen and Morse, made false assumptions that Lewis suffered memory issues prior to the accident which forms the basis of this lawsuit. *See* Exhibit K. In response, Moore requested a copy of the deposition of Lewis and the records relied upon by Owen. *See* Exhibit K. While Plaintiff's counsel had purportedly not obtained the deposition transcript, all of the other records requested by Moore were in the possession of Plaintiff's counsel, and had been since at least October 15, 2014. However, the records were not made available by Ms. Hudson to Moore. Instead, counsel chose to mischaracterize the foundation of Defendants' experts' opinions and prevented Moore from making an independent determination.

From that point, Plaintiff's counsel continued to provide inaccurate information in response to Moore's continued requests for Carla Lewis' deposition and records. On January 7, 2015, Kathryn Hudson responded to Moore advising that the Owen report was issued before Carla Lewis' deposition. *See* Exhibit L, email correspondence from Kathryn Hudson to Sarah Moore, January 7, 2015. However, Lewis' deposition was taken on December 2, 2014, and Owen issued her report on December 10, 2014, indicating she had considered Lewis' deposition in forming her opinions. Plaintiff's counsel went on to incorrectly advise Moore that Owen was

actually relying on the deposition testimony of Lewis' mother, Katherine Davis, in support of certain opinions regarding Lewis' memory and employment issues. *See* Exhibit L. Nowhere in the Owen report does she cite Davis' testimony for these propositions. Despite not having Davis' transcript, Plaintiff's counsel advised Moore that Davis' testimony was that Carla felt she was fired from her job, not because of memory issues, but because she had issues with two [sic] employees who were trying to get rid of her. *See* Exhibit L. Plaintiff's counsel's representations to her expert were incorrect and inserted counsel's own recollection and interpretation of the information rather than providing the expert with the objective evidence so clearly and consistently requested. Nevertheless, Moore continued to request the deposition of Carla Lewis, as well as her step-father Gerald Davis, indicating she needed to review them prior to her own deposition. *See* Exhibit L.

On January 9, 2015, with her deposition scheduled for January 14, 2015, Moore emailed Plaintiff's counsel inquiring whether other information was available. *See* Exhibit M, email correspondence between Kathryn Hudson and Sarah Moore on January 9, 2015 and January 10, 2015. In response, Kathryn Hudson advised Moore that she would seek to reschedule Moore's deposition, because she had not had time to go through the "volumes of CD's and documents" produced by Defendants. *See* Exhibit M. However, Plaintiff's counsel had been in possession of the information since October 15, 2014, which was produced on a single compact disk. Both attorneys for Lewis were provided with their own copy of the disk.

On January 14, 2015, Plaintiff's counsel advised Moore that she had not found Lewis' past medical records in the documents produced by Defendants. *See* Exhibit N, email correspondence from Kathryn Hudson to Sarah Moore, January 14, 2015. At that point, counsel informed Moore that the deposition of Lewis' was not ordered as "nothing was gleaned we did

not already know" and that Katherine Davis' transcript was not obtained as "nothing was covered that is not self-evident." *See* Exhibit N.  It is unfair for Ms. Hudson to impose her interpretation and opinions of the requested evidence on her expert.  Having done so, it clearly demonstrates the lack of reliability and inappropriate foundation for Moore's opinions.  Ms. Hudson further represented that the testimony of Gerald Davis, Lewis' step-father, *only* addressed her injuries and daily care.  *See* Exhibit N (emphasis added).  While Ms. Hudson appears to discount the significance of the testimony, her description actually evidences the importance and relevance of the information to the expert.  While Ms. Hudson downplays the benefit of the transcripts, she also points out that obtaining the materials was too expensive at the time. *See* Exhibit N.  Counsel is forcing her expert to rely on her interpretation of the testimony and its value with respect to the life care plan, rather than providing the expert with the materials the she has repeatedly indicated she needed to review.

Ultimately, Plaintiff's counsel acknowledged that it was Plaintiff's counsel's fault that Moore was not provided with the medical records she requested.  *See* Exhibit O, Tanya Owen Deposition, page 122.  Plaintiff's counsel confirmed that the records at issue were not discovered by her until late January of 2015.  *See* Exhibit O, Tanya Owen Deposition, page 122.  Plaintiff's counsel further acknowledged that Defendants had produced all medicals that they collected with Lewis' authorization.  *See* Exhibit O, Tanya Owen Deposition, pages 122-123.  Plaintiff's counsel acknowledged that the records that Defendants' counsel relied upon were important and that it was not Moore's fault she did not get them, but, rather, it was Plaintiff's counsel's fault.  *See* Exhibit O, Tanya Owen Deposition, pages 122-123.  Further, Plaintiff's counsel acknowledged that, in light of her representation of Ms. Lewis in this matter, if anyone had

access to Lewis' medical information in its entirety, it would be her.  *See* Exhibit O, Tanya Owen Deposition, page 122.

In addition, Moore concedes she did not undertake to correspond with Lewis' treating physicians prior to issuing her life care plan.  *See* Exhibit A, Sarah Moore Deposition, page 34.  Moore's limited communication with Lewis' treating physicians was a single questionnaire she submitted to Dr. Lindberg, *after* she had generated the life care plan.  *See* Exhibit A, Sarah Moore Deposition, page 7 (emphasis added); Exhibit O, Tanya Owen Deposition, page 97.  In this questionnaire, Dr. Lindberg was not asked to agree or disagree with the plan, but rather, was asked specific questions about Botox, future care needs, and 24-hour care, and Dr. Lindberg's response was limited to those specific questions.  *See* Exhibit O, Tanya Owen Deposition, pages 97-98.  Moore did not ask Dr. Lindberg if Lewis would at some point be weaned off seizure medications.  *See* Exhibit O, Tanya Owen Deposition, page 99-100.  There is nothing in the questionnaire that indicates that Dr. Lindberg reviewed the actual life care plan or accepted all of the information contained in the plan.  *See* Exhibit O, Tanya Owen Deposition, page 128.  The questionnaire is Moore's only correspondence with Dr. Lindberg.  *See* Exhibit A, Sarah Moore Deposition, page 26.   She did not submit questionnaires to any other physicians who treated Lewis.  *See* Exhibit A, Sarah Moore Deposition, page 7.  Moore acknowledged that the information she received from Dr. Lindberg in response to the questionnaire did not cause her to change her opinions or in any way alter her report.  *See* Exhibit A, Sarah Moore Deposition, pages 36-37.  Even Moore acknowledged that it was atypical for her to issue a report and then consult a treating physician.  *See* Exhibit A, Sarah Moore Deposition, page 34.  Moore explained that this was done in this case because there was some miscommunication on the deadline for the report.  *See* Exhibit A, Sarah Moore Deposition, pages 34-35.

Defendants rebuttal expert, Tanya Owen, has a Ph.D. in Rehabilitation and is a Certified Rehabilitation Counselor and a Certified Life Care Planner. *See* Exhibit O, Tanya Owen Deposition, page 11. Tanya Owen, reviewed and critiqued the life care plan authored by Sarah Moore. *See* Exhibit O, Tanya Owen Deposition, pages 9-10. Owen, like Moore, has never issued a life care plan without review of any medical records. *See* Exhibit O, Tanya Owen Deposition, page 126. Owen testified that there is a protocol for developing a life care plan and typically the first step is to review medical records. *See* Exhibit O, Tanya Owen Deposition, pages 126-127. Owen also testified that, in developing life care plans, it is also common for the life care planner to consult treating physicians and that it is not the normal protocol to issue a life care plan before consulting with a physician, as was done by Moore in this case. *See* Exhibit O, Tanya Owen Deposition, page 128.

As Owen points out, as a result of not having reviewed Lewis' medical records, Moore's life care plan makes no mention of Carla Lewis' pre-existing injury. *See* Exhibit O, Tanya Owen Deposition, page 23. Moore's life care plan ignores the significant 2003 motor vehicle accident involving Lewis and focuses entirely on the accident at issue in this case. *See* Exhibit O, Tanya Owen Deposition, page 76. Owen's verifies that a life care planner is required to consider what conditions existed before the accident at issue and to make allowances for this. *See* Exhibit O, Tanya Owen Deposition, page 76-77. As a result of Moore not having seen any of Lewis' medical records, Moore had no way of knowing whether Lewis' pre-existing conditions affect her projections of the cost to take care of Lewis as a result of the accident at issue in this litigation. *See* Exhibit O, Tanya Owen Deposition, pages 71 & 77-78.

Owen further points out that Moore should have but failed to inquire from Lewis' treating physiatrist as to how much weight should be given to Lewis' injuries that existed prior to the

2012 accident at issue. *See* Exhibit O, Tanya Owen Deposition, page 97. Despite Moore's access to and correspondence with Lewis' treating physiatrist, Moore failed to ask critical questions. *See* Exhibit O, Tanya Owen Deposition, page 97. Admitting Moore's report, which fails to take into consideration medical records showing Lewis' pre-existing conditions misleads the jury regarding what Lewis' condition was like before the 2012 accident. *See* Exhibit O, Tanya Owen Deposition, page 121. As Owen testified, one of the tenants of life care planning is that, if something exists before (i.e. a pre-existing condition), it should not be included in the life care plan. *See* Exhibit O, Tanya Owen Deposition, page 72. Without reviewing what medical assistance Lewis needed before the accident, one cannot determine the differences in the care needed post-accident which should be included in the life care plan. *See* Exhibit O, Tanya Owen Deposition, page 73. The jury will not, based upon Moore's life care plan, get a clear picture of what Lewis' life was like before the accident because she ignored, or was otherwise unaware of, all of these facts. *See* Exhibit O, Tanya Owen Deposition, pages 78-79. Moore's job as a life care planner was to parse out the difference between pre-existing needs and post injury needs. *See* Exhibit O, Tanya Owen Deposition, page 79. However, Moore was incapable of making these determinations based on the lack of information provided to her by counsel.

As an example, even Moore acknowledges that, had she had the opportunity to review the depositions of Carla Lewis and her mother, it may have affected her opinion on the inclusion of future costs for antidepressant medication. *See* Exhibit A, Sarah Moore Deposition, page 87. As Owen testified, because Lewis had a pre-accident diagnosis of depressions, projected costs for an antidepressant medication should not have been included in the life care plan. *See* Exhibit O, Tanya Owen Deposition, pages 66-67. A review of Lewis' medical records reveals this was a pre-existing condition such that the cost of the medication should be eliminated from the life care

plan.  *See* Exhibit O, Tanya Owen Deposition, page 69.  In this case, by virtue of Moore's failure to review Lewis' medical records and the depositions at issue in this litigation and her failure to consult with Lewis' medical care providers prior to generating the life care plan, her report completely ignores the pre-accident diagnosis of depression and represents that the only reason for Lewis' depression is the accident at issue without a consideration of the pre-existing depression diagnosed by Lewis' own treating physician within five months of this accident.  *See* Exhibit O, Tanya Owen Deposition, page 74.  Even Moore acknowledges that she cannot attribute the depression that Lewis experiences to one traumatic brain injury versus another.  *See* Exhibit A, Sarah Moore Deposition, page 103.  She acknowledges that whether documentation demonstrating that Lewis had taken medication for anxiety and/or depression prior to the accident would have affected her life care plan would be dependent on details on when and for how long Lewis took the medication and that this was the reason she typically asks to review medical records prior to generating a life care plan.  *See* Exhibit A, Sarah Moore Deposition, pages 59-60.

In another example of the unreliability of the methods employed by Moore in generating the life care plan at issue, Moore did not undertake to confirm Carla Lewis' life expectancy with any of her treating physicians.  *See* Exhibit O, Tanya Owen Deposition, page 128.  Owen testified that inquiry about life expectancy is required because the whole purpose of the plan is to provide a comprehensive plan of care for the person's life expectancy.  *See* Exhibit O, Tanya Owen Deposition, pages 128-129.  In this case, rather than consult any of Lewis' treating physicians, Moore derived a life expectancy of 48.2 years from a statistical life expectancy for white females Carla Lewis' age. *See* Exhibit A, Sarah Moore Deposition, pages 63-64.  In cases where an individual has suffered a significant injury, including traumatic brain injuries, a

reduction in life expectancy is possible and it was an unreliable method for Moore to fail to make this inquiry with Lewis' treating physicians.  *See* Exhibit O, Tanya Owen Deposition, page 129.  Moore fails to consider any potential reduction in life expectancy imposed on Lewis, including that which would have resulted from her 2003 traumatic brain injury.

In a final example of how Moore's inability to review Lewis' medical records and her failure to consult Lewis' treating physicians renders her opinions unreliable, Moore opines that Lewis should undergo yearly physical and outpatient therapy evaluations.  *See* Exhibit O, Tanya Owen Deposition, pages 62-63.  Moore acknowledged, however, that she did not know the last time Lewis had physical therapy or occupational therapy having never been provided records.  *See* Exhibit A, Sarah Moore Deposition, page 56.  In contrast, Owen testified that, when she generates a life care plan, she consults with the physical therapist and occupational therapist who provided services to the patient and asks for their recommendation for future treatment and evaluations (i.e. whether they need to be done yearly) and defers to those therapists' recommendations.  *See* Exhibit O, Tanya Owen Deposition, page 65.  Without the opinions of the occupational therapist or physical therapist on this issue, Owen testified that she would not know if yearly evaluations for the rest of Lewis' life were needed.  *See* Exhibit O, Tanya Owen Deposition, page 66.

As these examples reveal, Moore's life care plan lacks reliable foundation as is required by Federal Rule of Evidence 104.  It is also not grounded on valid reasoning or methodology as required by Federal Rule of Evidence 702.  It should, therefore, be excluded.

In the alternative to excluding Moore's testimony based on the unreliable methods employed and lack of foundation, Defendants request that Moore be precluded from changing or supplementing the opinions given in her report and during her deposition.  At the time of her

January 27, 2015 deposition, Moore testified that to the best of her knowledge her opinions at that time were final. *See* Exhibit A, Sarah Moore Deposition, page 21. She was not aware of anything she would change in the life care plan she generated but testified that that she might change it if different medical records indicate a change between then and trial. *See* Exhibit A, Sarah Moore Deposition, page 22. As discussed, Moore was not asked to issue a rebuttal report in response to Owen's opinions, presumably, in part, because she was not provided those opinions until after the rebuttal deadline. *See* Exhibit A, Sarah Moore Deposition, pages 102-103. The time for Moore to change her report as a result of the contents of Lewis' medical records or in rebuttal to the opinions of Tanya Owen has passed. Further, since Moore did not rely on any records, medical included, in formulating her opinions, the issuance of records since her report was issued should not serve as a basis for curing the defects in her current report or permit her to generate new opinions. Thus, to the extent Moore's opinions are not excluded in their entirety, she should be precluded from testifying as to any opinions that are outside the scope of those contained in her current expert report.

Respectfully Submitted,

*/s/ Kara B. Mikles*
KARA B. MIKLES, BAR NO. 2003088
AMY L. TRACY, BAR NO. 2010122
Attorneys for Defendants
MUNSON, ROWLETT, MOORE & BOONE, P.A.
400 West Capitol Avenue, Suite 1900
Little Rock, AR 72201
501/374-6535
kara.mikles@mrmblaw.com
amy.tracy@mrmblaw.com

*and*

        */s/ Michael L. Carr*
MICHAEL L. CARR, BAR NO. 2009169
STEVEN E. HOLDEN, BAR NO. 2009221
Attorneys for Defendants
HOLDEN & CARR
15 East 5th Street, Suite 3900
Tulsa, OK  74103
918/295-8888
MikeCarr@HoldenLitigation.com
SteveHolden@HoldenLitigation.com

## CERTIFICATE OF SERVICE

I, Kara B. Mikles, hereby certify that on May 8, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

| | |
|---|---|
| Gary J. Barrett | Kathryn L. Hudson |
| barrett@garyjbarrett.com | klhudson@hudson-lawcenter.com |

        */s/ Kara B. Mikles*
KARA B. MIKLES